92 N.J. Super. 309 (1966)
223 A.2d 281
ETHEL LAWLOR AND JOSEPH LAWLOR, PLAINTIFFS-APPELLANTS,
v.
A.J. KOLARSICK AND CHARLES W. PATERNO, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1966.
Decided October 14, 1966.
*310 Before Judges CONFORD, FOLEY and LEONARD.
Mr. William H. Burns, Jr. argued the cause for appellants (Messrs. Kantor & Burns, attorneys).
Mr. James D. Carton, III, argued the cause for respondents (Messrs. Carton, Nary, Witt & Arvanitis, attorneys).
The opinion of the court was delivered by FOLEY, J.A.D.
In this medical malpractice case plaintiffs appeal from a judgment for defendants entered upon a jury verdict of no cause of action.
Plaintiffs contend that the trial court abused its discretion in permitting "extensive cross-examination of an expert witness on inflammatory matters not relevant to the issues" of the case.
Consideration of plaintiffs' argument requires reference to the "Excerpts from Transcript" contained in the appendix, which consist solely of the testimony of Dr. Emanuel M. Josephson. The doctor was called as a witness by plaintiffs to render an opinion that defendants in their care and treatment of plaintiff Ethel Lawlor departed from standards of care recognized in the medical profession. In the course of the preliminary examination relative to qualifications, the doctor testified to his premedical and medical training and experience, his research of the surgical problem involved in the action, and the nature and extent of his activities as a practicing member of the medical profession. In the latter connection he stated:
"I have been engaged primarily in general medical work with special interest at various times in various fields. I am engaged in the practice of medicine as well as research. Research has been the basis of publication of numerous papers and leading journals here and abroad and also three books embodying my researches in medicine." (Emphasis added)
*311 At this juncture the following occurred:
"Mr. Burns [plaintiffs' attorney]: My hypothetical is going to take some time. Do you wish to cross-examine on the qualifications before I start, rather than have me read a question for twenty minutes?
The Court: Is there any cross on the qualifications?
Mr. Carton [defendants' attorney]: Well, it will be rather extended. I don't know whether I should do it now or as part of my general cross-examination. I will do it either way the Court wants.
The Court: I think perhaps we had better dispose of it at this point."
Defendants' attorney then conducted the cross-examination which is under review. Strictly speaking, it might well be said that portions of the cross-examination, if proper, were more appropriate to general cross-examination, as distinguished from cross-examination on qualifications, as defendants' attorney anticipated. However, plaintiffs make no point of this in their brief and the attorney for plaintiffs frankly stated on oral argument that the same objections to the cross-examination would have been made had it been a part of the general cross-examination. Furthermore, the witness was not held to be disqualified by the court, and the weight and sufficiency of the testimony was submitted to the jury subject to its determination of credibility. Thus, the meritorious question before us is whether the trial judge, regardless of the stage of the case, mistakenly exercised his discretion in granting the latitude of cross-examination which appears in the record.
In this connection it should be pointed out that the scope of cross-examination is a matter for the control of the trial judge and that an appellate court will not interfere with such control unless clear error and prejudice is shown. Soronen v. Olde Milford Inn, 84 N.J. Super. 372, 373, 381 (App. Div. 1964). Accord, Rivera v. Grill, 65 N.J. Super. 253 (App. Div. 1961), certification denied 34 N.J. 471 (1961); Rynar v. Lincoln Transit Co., 129 N.J.L. 525 (E. & A. 1943).
Plaintiffs at the outset of their brief concede that this is the rule. They argue only that questions put to the doctor *312 concerning the contents and titles of some of his non-medical writings were intrinsically "inflammatory," and wholly irrelevant to the issues presented in this medical malpractice case, as for example, pamphlets written by the doctor entitled "The Strange Death of Franklin D. Roosevelt," and "Rockefeller, the Internationalist," "Wake Up America! We Finance Rockefeller Interests," "America's Betrayal, the Rockefeller Empire," "Kennedy's General Aniline Deal," and an article, "The Red Record of Adlai Stevenson, Stalin's Choice for President," and his allusion to Nelson Rockefeller personally.
Standing alone, it is doubtful that the admitted discretion of the trial judge would be so broad as to permit the doctor's political, and perhaps economic, views to reach the ears of a jury. However, they may not be so isolated, but must be considered in the context of the doctor's entire testimony, and the legitimate purposes of cross-examination. As noted above, the witness attempted to convey the impression that he was qualified to testify by reason of the fact, among others, that he devoted his time primarily to general medical work and medical research and that he was essentially a "full time" practicing doctor. The stated purpose of the cross-examination under scrutiny was to establish that the doctor's interests were deeply involved in time-consuming activities in other fields which affected his credibility in his assertions concerning the time and thought spent on problems within the field of medicine, particularly since the witness admitted that in the course of his very lengthy career he had written between 5,000 and 10,000 articles along with 14 books, a large part of which were on non-medical subjects, and maintained in the same building in which his medical offices were located a publishing establishment, the business of which was to arrange for the publication of his extensive writings.
It is unfortunate that the nature of the doctor's non-medical writings and the titling of them might have had the side effect of prejudicing jurors who did not share his views. But the trial judge in his discretion was entitled to permit the defendant to bring to the attention of the jury the evidence *313 from which that body could infer that by reason of his non-medical interests the witness's purported knowledge of the medical problem presented by the case was less than he claimed, and that such deficiency affected his credibility, and thus the weight to be accorded to his testimony.
Nor may the doctor's testimony relative to his writings on medical matters and the medical profession, even though not directly under attack, be disregarded, since it formed a background, was in a general sense related to the examination on non-medical writings, and in combination with the latter could have had bearing upon the issue of whether or not he was an essentially credible witness. Specifically, in some instances the propriety of the witness's published views regarding the medical profession, when viewed in the context of the entire evidence, was susceptible of inferences that the doctor had exhibited bias against the medical profession generally. For example, he had written a book, "Rackets, Social Service and Medical," which had been published by his own publishing firm, Chedney Press, and another similarly published, "Your Life is Their Toy. Merchants in Medicine," in which he stated that "surgery per se is a simple, mechanical art that can be learned readily by a moron." When questioned about this, he glibly stated that "it has been done repeatedly." When interrogated further upon this subject the witness stated that he had also written, "there are few operations as complicated as rebuilding a pair of shoes." That viewpoint could not only be considered as evidencing bias but it could also be interpreted as a cynicism deeply affecting the depth of his knowledge.
In the same work he, who was prepared to answer a hypothetical question, stated:
"Hypothetic [sic] questions are a part of the chicanery of the law. But they are downright dishonest when used in these medical cases. For they imply an omniscience which neither the medical profession nor any of its members possess. There is so much that it is not known about physiology that it is utterly impossible for any honest physician to say that any disease or physiologic derangement may or may not follow on any specific injury. The honest physician can *314 merely testify that in his knowledge or opinion the consequences of a specific injury are usual or unusual. If he says more, the physician is either stupid or he lies."
Lastly, it is observed that upon the trial judge's view of the testimony he might well have concluded that the witness was evasive, and thus that he should grant greater latitude in cross-examination than he otherwise might. For example:
"Q. Do you regard these textbooks as authorities?
A. For the purpose for which I used them, yes.
Q. This is the first time you have looked at a textbook for a long time, isn't it, Doctor?
A. No.
Q. When have you previously looked at textbooks?
A. Whenever I had occasion to.

* * * * * * * *
Q. How much of your time, Doctor, do you spend now practicing medicine?
A. As much time as my practice requires."
Professor McCormick illuminates the problem involved in this case. He states:
"There are three main functions of cross-examination: (1) to shed light on the credibility of the direct testimony; (2) to bring out additional facts related to those elicited on direct, and (3) in states following the `wide-open' rule, to bring out additional facts which tend to elucidate any issue in the case. As to cross-examination designed to serve the second or third of these functions, there seems to be no reason why the usual standard of relevancy as applied to testimony offered on direct examination should not equally be applied to facts sought to be elicited on cross-examination.
As to the first function, that of evaluating the credibility of the evidence given on direct, the object and purpose is contrastingly different. Here the test of relevancy is not whether the answer sought will elucidate any of the main issues, but whether it will to a useful extent aid the court or jury in appraising the credibility of the witness and assessing the probative value of the direct testimony." McCormick, Evidence (1954), § 29, pp. 54-55.
Considering the witness's testimony in the aggregate and in context, we are satisfied that the trial judge in the exercise of his discretion was within the proper discharge of his *315 functions in acting in the manner which is criticized on this appeal.
The judgment is affirmed.