95 N.J. Super. 71 (1967)
230 A.2d 139
JOSEPH J. MAZZA, PLAINTIFF-APPELLANT,
v.
DANIEL McCOY WINTERS AND RAYMOND L. CUNEFF, JR., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 17, 1967.
Decided May 5, 1967.
*73 Before Judges CONFORD, FOLEY and LEONARD.
Mr. Nicholas Scalera argued the cause for appellant (Mr. Ernest N. Giannone, attorney).
Mr. James D. Carton, III argued the cause for respondents (Messrs. Carton, Nary, Witt & Arvanitis, attorneys).
*74 The opinion of the court was delivered by FOLEY, J.A.D.
In this medical malpractice action plaintiff appeals from a judgment in favor of defendants which was entered on a jury verdict of no cause of action.
Defendants are partners specializing in the practice of orthopedics. On October 30, 1960 plaintiff fell while at work, sustaining a comminuted fracture of his right tibia and fibula. He was taken to the emergency room of Riverview Hospital in Red Bank where he was treated by defendant Winters. Thereafter, both defendants treated plaintiff continuously until July 14, 1961. There was some dispute as to the circumstances surrounding the termination of this care and treatment. In any event, plaintiff consulted Dr. Anthony Pisani in September 1961, who advised surgery to correct the condition he found on examination. Doctor Pisani operated upon plaintiff in November 1961, removing cartilage and resetting the break of the fractured bones.
In his complaint plaintiff alleged inter alia that defendants "negligently failed to apprise plaintiff of his need for further surgery, and did conceal from the plaintiff his need for further surgery * * *." (Emphasis added)
On this appeal plaintiff argues that (1) the court erred in refusing to instruct the jury to consider whether or not defendants fraudulently concealed from plaintiff his true condition, and concerning the law on such a cause of action; (2) the court abused its discretion in the latitude and scope allowed to defendants on cross-examination of plaintiff's expert; (3) the summation of defense counsel so exceeded the bounds of proper advocacy as to constitute plain error, and (4) the court erred in refusing to instruct the jury that they could draw an unfavorable inference from defendants' failure to produce an expert witness listed in answers to interrogatories, and in restricting plaintiff's summation thereon.

I
Plaintiff submitted the following written request to charge:
*75 "The relationship of a physician-patient is fiduciary in character and silence by either defendant when there is a duty to disclose the true nature of plaintiff's condition constitutes fraudulent concealment upon which liability can be predicated."
In relation to this point the judge charged as follows:
"It is contended by the plaintiff that there was a failure on the part of the respective defendants to advise the plaintiff of his condition, which constituted a deviation and violation of good medical practice, and that as a proximate result thereof he sustained injuries * * * to a greater extent than would have normally followed his accident of October 30, 1960.

* * * * * * * *
You will recall it was contended by the plaintiff that there was a failure to disclose the true nature of his condition, and that he was abandoned by the defendant or defendants, as the case may be. In this instance, I think he referred to Doctor Winters. However, it will be your recollection that will control. In order to establish such an abandonment, you must determine whether the treatment was unjustifiably terminated by Doctor Winters, or that he refused to treat the plaintiff at the time when treatment was needed, or that he withdrew from the case without consent of the plaintiff, or that he told the plaintiff no further treatment was needed at the time when future treatment was needed. You will recall further that this is categorically denied by the defendants, and therefore becomes a question of fact for you the jury to determine within the rules of law as the Court has already charged you." (Emphasis added)
At the conclusion of the charge exception was taken as follows:
"In substance, you covered my charge, but maybe I didn't hear right, in number twelve you said there was a contention there was a concealment, but you didn't go further, if you find that there is a duty to disclose, if you find they didn't disclose, and if you find this constitutes fraudulent concealment upon which liability alone can be predicated.
THE COURT: I refuse to charge that in the language that you have it stated. I think I have included all the rest of your material."
Plaintiff contends that the court's charge relating to the failure to disclose to plaintiff the true nature of his condition erroneously fell short of the request to charge that such *76 failure amounted to a fraudulent concealment by reason of the fiduciary character of the physician-patient relationship. We find no merit in this contention. In the first place fraudulent concealment was not alleged in the complaint or included in the pretrial order as an issue to be tried. It did not come into the case until the request to charge in question was made. On the contrary, the alleged concealment or failure to disclose was relied upon by plaintiff only as an element of his basic charge of negligence. In that regard the charge of the court adequately laid the issue before the jury.
Fraud, as such, may be made the basis of a claim for relief, but in that event the one asserting it must prove the essential elements of the action which, of course, are (1) a representation by defendant to plaintiff with intent that the latter rely upon it; (2) knowledge on the part of defendant that the representation is in fact false; (3) belief by plaintiff that the representation is true; (4) reliance on such representation, and (5) injury. See Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 379-380 (App. Div. 1960). Fraud and malpractice are viewed as separate causes of action. See Thomas v. Beckering, 391 S.W.2d 771 (Tex. Civ. App. 1965). Leaving aside the inadequacy of the complaint in respect of charging fraud as a claim separate and apart from malpractice, the proofs did not establish all of the elements of fraud, which is a prerequisite to recovery on that cause of action. Moreover, the requested charge submitted by plaintiff is incorrect and incomplete as a statement of the applicable law.
We conclude, therefore, that not only was the charge adequate in light of the pleadings and proofs but the court would have been in error had it granted plaintiff's request. Furthermore, it was to plaintiff's advantage that the court treated concealment as an element of negligence since plaintiff thereby was relieved of the more onerous burden of proving the elements of fraud.

*77 II
Doctor Robert Tuby was called as an expert witness by plaintiff. He was examined preliminarily by plaintiff's attorney concerning his qualifications. Defendants' attorney did not seek to examine the doctor on a voir dire, nor did he object to the doctor's qualifications. However, on cross-examination the defense attorney examined on that subject at considerable length, evidently to affect the weight of the doctor's testimony, and specifically his opinion. In the course of that examination the doctor was asked whether he had ever been known by a name other than Robert Tuby. The question, although irrelevant (at least at that stage of the case), was not objected to. The doctor replied that he had; that his name was Rubin Tubowitz and that it was changed in 1928 to Robert Tuby. At that point plaintiff objected:
"MR. GIANNONE: I wonder, Mr. Carton knew this before he asked that question, what was his purpose in asking that question. I object and say that should be stricken from the record.
MR. CARTON: If I say it in front of the jury I will be criticized. Shall I or shall I not say it in front of the jury?
THE COURT: Say what?
MR. GIANNONE: I don't know what he wants to say, unless it is something this man did when he had his former name. If there is nothing he did when he had this former name, there is no reason to say why this man had a change in name. Many people have their names changed and there is nothing wrong in it.
THE COURT: There is nothing illegal about it.
MR. GIANNONE: Of course not.
THE COURT: I will permit the question to be answered, and I think he has answered it."
The attorney then asked the witness whether, in the "very same courthouse," he had denied under oath that he had ever been know by a name other than Robert Tuby. Again no objection was made to the relevancy of the question. The doctor started to answer but was interrupted by defendants' attorney. At that point plaintiff's attorney insisted that the witness be permitted to complete his answer. The following then occurred:
*78 "I said I don't recall that I denied it. I may have, but I was so shocked; this is the first time in 35 years that that question was asked of me. And, it was perhaps because of that, because I graduated from the Medical College as Robert Tuby. The name was changed in my third year in Bellevue, which was in 1928, so that I was sort of taken aback when you asked me that question in the case. It has never been asked of me before. You were the first one that ever did that. You were the first one that ever did that in 37 years."
The attorney pressed the matter further and the doctor said that he did not deny that he had testified in the prior proceeding that he was never known by a name other than Robert Tuby. His attention was then drawn to the stenographic transcript in the earlier case and the transcript was read at length. From such reading it appeared affirmatively that the witness had testified that he had never been known by any name other than Robert Tuby, that such testimony was untrue, and that he had been known as Rubin Tubowitz. However, the concession by the doctor that his answer in the previous trial was untrue was only obtained after lengthy and to some extent acrimonious dialogue between the witness and the attorney. The entire subject of the change of name and the episode at the prior trial was again explored in defendants' summation, although without objection by plaintiff.
We recognize that the scope of cross-examination is a matter for the control of the trial judge and that an appellate court will not interfere with such control unless clear error and prejudice is shown. Lawlor v. Kolarsick, 92 N.J. Super. 309 (App. Div. 1966), and cases therein cited. However, the extent of allowable cross-examination where it involves collateral matters should be measured by the trial judge in light of the effect of such examination upon substantial justice. Whether the doctor had changed his name from Rubin Tubowitz to Robert Tuby, and whether in another case, tried three years before, he testified falsely that he had always been known as Robert Tuby, was totally irrelevant to the issues of the present case. Cf. Lawlor v. Kolarsick, supra. We express no opinion whether the falsity of testimony in *79 another trial on a presently irrelevant issue is per se admissible to affect the credibility of the witness. However, the subject dealt with a collateral matter of a nature which had the capacity to prejudice the jury against the witness for having changed his name (which he had a legal right to do) and, subsequently, for having attempted in another trial to hide this innocent act. The extent of the cross-examination and the acrimony involved therein certainly tended to create a trial within a trial, which may well have obscured in the minds of the jurors the pleaded issues in the case. The absence of objection by plaintiff, whether for tactical reasons or otherwise, would require us to conclude that "plain error" was committed in order to reverse on this ground. Not only did plaintiff not object to the lengthy cross-examination on this subject upon any tenable ground, or to its mention in summation, but his silence in that regard constituted a tacit invitation to his adversary to fully expose what occurred at the earlier trial. We conclude, therefore, that this point, viewed in isolation, cannot be made the basis for invoking the plain error rule. R.R. 1:5-3(c).

III
In his summation defendants' attorney attacked Dr. Tuby in strong language. He referred to him as a "real pro," in view of his testimony that he had been consulted by attorneys in about 350 cases in the last year and testified in 90 of them. This was a fact in evidence upon which the attorney had a right to comment and we cannot say that he exceeded the bounds of proper advocacy in this portion of his argument. At another point in the summation, as noted above, the attorney turned to Doctor Tuby's change of name. Conceding that "the fact that a person used a different name means nothing" he went on to say in connection with the conflict between the testimony of Dr. Tuby and defendants' medical evidence that Dr. Tuby "three years ago and in this very courthouse lied  and I say lied  and I do not *80 say made a mistake, lied under oath, I say his testimony is not worthy of credence." In light of the fact that Dr. Tuby's testimony concerning the earlier case came in without proper objection, as we have noted in the previous point, we would not reverse. However, we cannot completely overlook the matter as we consider the potential impact of the whole summation upon substantial justice.
We do find in the summation a clear basis for reversal on another ground. Concededly, this medical malpractice case was essentially a battle of the experts in which the credibility and expertise of the medical witnesses called by both sides was deeply implicated in the result. Following his attack upon Dr. Tuby, defendants' attorney, referring to the doctors who had been produced in behalf of defendants, said:
"All of those three men all had graduate training on this work, all have specialized, and two of them, Doctor D'Elia and Doctor Otis, are selected by the Supreme Court of New Jersey as some doctors who are to be brought in on disputed medical questions in reference to an injury, as an impartial observer for the Court, and an impartial witness to be called in if the Court sees fit to do it. [The witnesses had so testified in listing their qualifications.]
Do you think our Supreme Court is going to reach out and grab somebody with no qualifications? Do you think they are going to grab somebody who doesn't realize what an expert is? But, our Supreme Court thinks enough of those two men, Doctor Otis and Doctor D'Elia, to put them on a committee, so if a judge decides he wants an impartial witness, the judge can do it, and our Supreme Court says these are some of the impartial witnesses."
Initially, we point out that the statement that two of the doctors were selected "by the Supreme Court of New Jersey" as impartial witnesses was incorrect. Under R.R. 4:25A the Administrative Director of the Courts is required to maintain a panel of impartial medical experts. The specialties to be represented on the panel and the number of experts in each specialty are determined jointly by the Medical Society of New Jersey and the Advisory Committee appointed by the Supreme Court. The experts to serve on *81 the panel in the several specialties are designated by the Medical Society of New Jersey. The Administrative Director of the Courts supplies the names of individual witnesses from the panel at the request of a trial judge in a particular case. Thus, while the rule was promulgated by the Supreme Court in the exercise of its rule-making function, the court did not reserve to itself either the selection or the formulation of the panel. The selection was allocated to the Medical Society of New Jersey and the formulation of the panel to that body and the Advisory Committee.
But leaving aside the arrant misrepresentation that "our Supreme Court says that these are some of the impartial witnesses" which it had "selected * * * as some doctors who are to be brought in on disputed medical questions * * * as an impartial observer for the Court, and an impartial witness to be called in if the Court sees fit to do it," we repeat what we said on this subject in Zenson v. D'Elia, 94 N.J. Super. 164 (App. Div. 1967):
"In our judgment, appointment to such a panel, although undoubtedly an honor, was not intended to add generally to the qualifications of the expert in the sense that a medical degree might  nor do we think it intended that as the expert's qualifications are weighed by a jury there should be placed in the scales the prestige of the Supreme Court which promulgated the rule pursuant to which he was selected. For these reasons we hold to be improper the showing of appointment to the panel, at least in a case in which he is not called to testify as an impartial witness, in accordance with the rule of court." (at p. 169)
We are convinced that viewing the summation as a whole in the context of this case in which the weight of the medical testimony was the paramount issue, defendants' unabashed effort to swing the balance in their favor because two of their witnesses were on the panel of "impartial witnesses" made up by the Administrative Director to serve another purpose had a clear capacity for producing an unjust result, and constituted plain error. We therefore reverse.

*82 IV
In view of this disposition of the case we find no necessity to discuss at length plaintiff's point that the court erred in refusing to instruct the jury that it could draw an unfavorable inference from defendants' failure to produce an expert witness listed in the interrogatories and in restricting plaintiff's summation thereon. Suffice it to say that in the circumstances of this case we do not find this to have been error.
Reversed and remanded for a new trial.