131 N.J. Super. 535 (1974)
330 A.2d 628
AGNES M. JANUS AND VALENTINE JANUS, PLAINTIFFS-RESPONDENTS,
v.
HACKENSACK HOSPITAL, JULES C. LADENHEIM AND GEORGE B. JACOBS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 1974.
Decided December 23, 1974.
*536 Before Judges LEONARD, SEIDMAN and BISCHOFF.
*537 Mr. Richard E. Brennan argued the cause for appellants Ladenheim and Jacobs (Messrs. Shanley & Fisher, attorneys).
A satement in lieu of brief was filed on behalf of defendant Hackensack Hospital by Mr. Edward A. Olson; Messrs. Winne & Banta, attorneys.
Mr. Charles J. Kahwaty argued the cause for respondents.
The opinion of he court was delivered by LEONARD, P.J.A.D.
In this malpractice case defendants appeal from a judgment following a jury trial in favor of plaintiff Agnes Janus (plaintiff) in the sum of $10,000 and in favor of her husband plaintiff Valentine Janus in the sum of $125,000.
On March 13, 1968 plaintiff fell down a flight of stairs at her home and was taken by ambulance to a hospital where she remained for two days. Thereafter she was transferred to defendant Hackensack Hospital (Hackensack). Thereat she came under the care of defendant doctors, Jules C. Ladenheim and George B. Jacobs, both neurosurgeons. Upon a review of her angiogram Dr. Ladenheim immediately performed a craniotomy, removing and discarding a portion of plaintiff's brain matter. Following surgery plaintiff was placed in the Intensive Care Unit at Hackensack. On March 22 Dr. Jacobs directed that she be transferred to a semi-private room. Partial side rails, which extended approximately one-third of the length of the bed, were ordered and installed on her bed.
On March 25 plaintiff left her bed and was found at 2:45 A.M. lying on her back in the hallway outside her room in a pool of blood which had seeped from the suture line on her head. Following this fall, a second craniotomy was performed by Dr. Ladenheim.
The liability and damage features of the case were closely contested and each side primarily relied upon medical expert *538 witnesses. Plaintiff called three physicians and defendant doctors called two other physicians besides testifying themselves.
On the liability issue plaintiff's theory was that defendants were guilty of malpractice in failing to provide full bed rails or Posey restraints[1] after she was transferred to a semi-private room on March 22, 1974. Plaintiff's experts, Dr. Robert Tuby and Dr. Max Tesler, were of the opinion that defendants deviated from accepted standards of medical and hospital practice in failing to have one or the other of these restraints placed on plaintiff's bed. On the other hand, defendant doctors and their two experts were of the opinion that such restraints were contraindicated and that the use of partial rails comported with standard medical practice. They further asserted that full bed rails would not prevent a patient from voluntarily getting out of bed.
As to plaintiff's injuries, Dr. Tuby testified that following the first fall and operation plaintiff would have made a full recovery but for the fall of March 25, 1974 which caused her present permanent residual brain damage. To the contrary, defendant doctors and their experts testified that plaintiff's present condition was caused by her original fall in her home and not by the latter hospital fall. Dr. Tesler did not testify as to her injuries.
We consider first defendants' contention that the trial judge committed reversible error in prohibiting defense counsel from cross-examining plaintiff's medical experts as to their experience and background in testifying in medical malpractice cases in the past.
Primarily they complain of the judge's action with regard to the cross-examination of Dr. Tuby. On direct examination this witness, who was licensed to practice medicine in New York in 1930, gave his educational and medical background. *539 He testified to his experience as a surgeon which terminated in 1959. Since that time he stated that
* * * my work consisted mainly of examining injured people, since that was my specialty, traumatic surgery, for lawyers, rendering medical reports of my findings and coming to court to testify when requested.
I also reviewed medical files for attorneys throughout the United States with regard to whether there was malpractice on the part of either the doctor or a hospital.
I would render these reports to the attorneys and if the case had merit and they required my services at trial, I would testify in these cases.
Also I have spent many years teaching attorneys medicine and by invitation I have addressed the medical-legal societies throughout the United States, Canada and Puerto Rico, to attorneys, and have written books on medicine for attorneys.
On cross-examination by the attorney for Hackensack he also stated that he had not been treating patients for some time and had co-authored two legal-medical articles for lawyers.
The first question propounded to Dr. Tuby on cross-examination by the attorney for defendant doctors was, "How many times have you testified in malpractice cases in the last ten years?" Plaintiff's objection was sustained and the jury instructed that they were to "ignore any implications from that question." Defense counsel then asked "Have you ever testified as ____? The court interrupted, excused the jury and requested defense counsel to make an offer of proof.
Counsel replied that he desired to ask the doctor how many times he had testified in court in the last ten years, the number of times he testified for plaintiffs or defendants, and the various medical specialties upon which he had held himself out to be an expert during that period.
Following this colloquy between counsel and court the judge ruled that "all questioning along that line is excluded. Any further reference by you to that subject in your cross-examination will result in the imposition of sanctions by the court." Defendant objected to the ruling.
Thereafter, defense counsel marked for identification five transcripts of the testimony of Dr. Tuby in other cases and *540 advised the court that he was doing so in order that the record would disclose the proffer of the matters into which he intended to inquire had he been afforded the opportunity to fully cross-examine the witness. The judge reiterated his previous ruling, stating that he did not believe such an inquiry to be "relevant or material in terms of the evaluation of his testimony." Excerpts of the cross-examinations contained in these transcripts have been included in appellants' transcript as a part of that proffer. They reveal that in the last ten years Dr. Tuby has testified in malpractice cases on a great number of occasions and in various states. He has appeared exclusively for plaintiffs and has given expert opinion on numerous medical specialties.
Although defense counsel did not attempt to make such a specific inquiry of Dr. Tesler, plaintiff's other expert witness, he now asserts that he did not do so because of the court's previous ruling and the probability of the imposition of sanctions if he did. Direct examination indicated that this doctor was a board-certified internist specializing in gastroenterology. Since 1970, although continuing his practice, he also has been actively associated with a commercial testing laboratory.
Ordinarily the scope of cross-examination of a witness rests in the discretion of the trial judge, State v. Petillo, 61 N.J. 165, 169 (1972), and an appellate court will not interfere with the control thereof by him unless clear error and prejudice is shown; Graf v. Folarno, 99 N.J. Super. 173, 176 (App. Div. 1968); Mazza v. Winters, 95 N.J. Super. 71, 78 (App. Div. 1967); Lawlor v. Kolarsick, 92 N.J. Super. 309, 311 (App. Div.), certif. den. 48 N.J. 356 (1966). Stated another way, we will not interfere "absent a clear abuse of that discretion." Cestero v. Ferrara, 110 N.J. Super. 264, 273 (App. Div. 1970), aff'd 57 N.J. 497 (1971). Specifically, it has been held that the control of a cross-examination solely tending to test the credibility and trustworthiness of a witness rests in the sound discretion of the trial judge, subject only to the consequence of its *541 abuse. State v. Bartell, 15 N.J. Super. 450, 455 (App. Div. 1951), aff'd 10 N.J. 9 (1952).
In evaluating the issue presented herein, we must be mindful of the fact that one of the three main functions of cross-examination is to shed light on the credibility of the direct testimony. In this respect the test of relevancy is whether the examination will aid the judge or jury to a useful extent in appraising the credibility of the witness and assessing the probative value of the direct testimony. McCormick, Evidence, § 29 at 54-55 (1954), cited with approval in Lawlor v. Kolarsick, supra, 92 N.J. Super. at 314.
A medical witness' "testimonial and experiential weakness * * * such as his status as a general practitioner, testifying as to a specialty * * * may be exposed by the usual methods of cross-examination." Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 86 (App. Div. 1961). The extent to which a medical expert witness may be cross-examined in an attempt to impair his credibility and establish bias is well demonstrated in Lawlor v. Kolarsick, supra. See also Mazza v. Winters, supra (which, incidentally, involved Dr. Tuby).
As previously noted, the issues of malpractice, causal connection and damages were strongly contested. Credibility of the competing medical witnesses was a paramount factor to be first determined by the jury in resolving the controversy. Under these circumstances, and in the light of the previously discussed legal principles, we conclude that the action of the trial judge in preventing the full cross-examination of Dr. Tuby, and impliedly of Dr. Tesler, constituted a mistaken exercise of his discretion which amounted to "clear error and prejudice" to defendants. It was clearly capable of producing an unjust result, R. 2:10-2, and accordingly mandates a reversal and the granting of a new trial.
In view of this conclusion, we do not find it necessary to consider any of the other contentions raised by defendants.
Reversed and remanded for a new trial in accordance herewith.
NOTES
[1] A Posey restraint is a "cloth or canvas attachment put on a patient and fastened to the bed preventing the patient from turning in bed or sitting up."