# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0517-23

G.W.,

    Plaintiff-Respondent,

v.

J.H.,

    Defendant-Appellant.

_____

Submitted November 13, 2024 – Decided December 9, 2024

Before Judges Smith and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-1496-23.

Helmer Conley & Kasselman, PA, attorneys for appellant (Patricia B. Quelch, of counsel and on the brief).

Respondent has not filed a brief.

PER CURIAM

Defendant, J.H.[1] appeals from the June 13, 2023 final protective order ("FPO") issued under the Sexual Assault Survivor Protection Act ("SASPA"), N.J.S.A. §§ 2C:14-13 to 2C:14-21 (2016),[2] and the September 23, 2023 order denying reconsideration of the same. Because we conclude that plaintiff, G.W., satisfied her burden of demonstrating a predicate act as defined under SASPA, and there was a possibility of future risk to her safety and well-being, we affirm.

I.

We derive the following facts from the plaintiff's testimony at trial. Both plaintiff and defendant attended Rider University. Defendant was an acquaintance of plaintiff, whom she had met through Greek Life at the University.

A Greek Life event, the Big Day Party, occurred in March 2023. Plaintiff attended the party where alcohol was served, and plaintiff was drinking. Plaintiff met defendant at the party and the two talked. At one point plaintiff touched defendant's chest and abdomen area, but only for a second. Other than this brief interaction, plaintiff never hung out with defendant, never went on any

_____

[1] We use initials pursuant to protect the confidentiality the parties involved in the litigation. Rule 1:38-3(c)(12).

[2] As of January 1, 2024, SASPA has been renamed The Victim's Assistance and Survivor Protection Act ("VASPA").

dates with defendant, nor was invited to attend any events by defendant. Plaintiff did not have defendant's cell phone number, nor was plaintiff connected with defendant on any form of social media.

The night of April 29, 2023, was the Senior Ball and plaintiff went with her friends. There was alcohol at the Ball and plaintiff recalled having four drinks. Plaintiff described herself as intoxicated by the end of the evening and testified to having only a partial memory of that night. Plaintiff left the party with her five friends to go to a liquor store before returning to campus. At the liquor store, plaintiff purchased a BuzzBall, which is a canned alcoholic drink mixed with juice.

Plaintiff and her friends went to their dorm building and got ready for an after party. Plaintiff remembers having another drink at that time. They left for the party at approximately 11:15 p.m. They stayed at the party for almost three hours. Plaintiff drank additional alcoholic drinks at the party: the BuzzBall, a Hard Lemonade, and a quarter of a bottle of an unknown size of vodka. Plaintiff recalled seeing defendant at the party.

Plaintiff and her friends left the party at approximately 2:15 a.m. and returned to plaintiff's dorm building. During the walk, she received a request from defendant by Instagram. Plaintiff gave the necessary permission for him

A-0517-23

to "follow" her on a social media application ("app") called Instagram. Defendant then sent her a direct message via Instagram, requesting she send him her "Snap." She sent the necessary information, and defendant added plaintiff on the app, Snapchat.

Defendant then asked plaintiff if she was on campus, to which she replied yes. He asked if he could come over and she said yes. Plaintiff's two friends walked with her to her dorm building and left when she saw some of her sorority sisters. Plaintiff was in her room by 3:00 a.m. and defendant arrived around the same time.

Plaintiff assumed they would talk or "kiss or something like that." According to plaintiff, defendant entered her dorm room through the unlocked door and pushed her on her back on the bed before he began kissing her. Defendant unbuttoned her pants and then went into the bathroom for almost five minutes. During the time defendant was in the bathroom, plaintiff just laid on her bed and felt intoxicated, stating that she "felt pretty out of it at that point." When defendant returned, he resumed kissing her while removing her shirt and pants. He took off his own clothing.

Plaintiff testified at this point, "it's kind of a blur, but at some point, his penis entered my vagina and I told him to stop because I didn't want to have sex

A-0517-23

with him." Defendant completely disregarded plaintiff's wishes to stop and tried to penetrate her again. Plaintiff then placed her hand over her vagina to prevent him from penetrating her again. At one point, defendant removed plaintiff's hand away and tried to penetrate her again. Plaintiff stated, "the next thing I remember is that he was inside of me again and my arms were up above my head and he was holding my arms." Plaintiff attempted to move her arms and tried to speak, but because of her intoxicated state and the fact that defendant had pinned her arms above her head, plaintiff was unable to move and could only mumble. Defendant also penetrated plaintiff with his fingers and touched her breasts as well as put his mouth on her breasts and neck. Plaintiff had no recollection of what occurred next but remembered defendant getting dressed and leaving her dorm. Plaintiff had never had sexual relations with anyone before and "absolutely" remembered that she did not consent to engaging in sexual relations with defendant. Plaintiff remained in her bed for some time before she dressed and went looking for one of her sorority sisters who lives in her dorm building. She found a friend and went with her to her friend's room. Plaintiff indicated she was confused and not sure what had just happened. After speaking with her friend, plaintiff used the restroom and returned to her room to sleep.

5

When plaintiff awoke the next morning, she noticed her lip was swollen and the skin broken in the middle of her bottom lip. She also had a mark on her neck and left breast. She alleged pain and discomfort in her genital area; she noticed the pain that night when defendant entered her with his fingers. Plaintiff then spoke with some of her friends, who were telling her about their night. Because she "just didn't really feel right," plaintiff called her mother and spoke with her about what had happened. Plaintiff testified that she "put the pieces together" and realized more had happened that night than she wanted or consented to. Her mother came and took plaintiff to the hospital for a Sexual Assault Nurse Examination.

Plaintiff stated she went and applied for a temporary protective order because she feared defendant and didn't want him to contact her or be near her. Moreover, she testified she was still scared of him and didn't want to be near him again. She also told the judge that she feared defendant would seek retaliation because she came forward with the allegations against him and she wanted to protect herself from what he might do in the future.

At trial, plaintiff testified that she had turned off her location services on her phone on the day of the hearing. She also testified that since the temporary

6

protective order was entered, defendant had not contacted her either directly or through a third party.

After plaintiff completed her case, counsel for defendant asked the court to rule that defendant could testify for the limited purpose of discussing the protection and safety of the victim. The plaintiff objected and the court held that to preclude plaintiff's counsel from cross-examination which "affects credibility, motivation, and the like" would be unfair to the plaintiff. Defendant then elected not to testify.

After closing arguments, the court granted the protective order. In doing so, the court likened a SASPA case to a domestic violence case, noting the plaintiff in each had the burden of proof by a preponderance of the credible evidence that a predicate act had occurred and there was a need for the continuing protection of an FPO.

The court found plaintiff credible and noted the lack of testimony from defendant, causing a concomitant lack of information as to his version of the events leading to the interaction between the parties and his subsequent actions. Moreover, the court found sexual penetration occurred that was not freely and affirmatively consented to by a preponderance of the credible evidence. The court also determined that plaintiff's "fear that she has, that she's afraid, she's

7

scared, she doesn't want to be in his presence, whether or not there's retaliation or not, affects her state of being happy, healthy, and prosperous." Therefore, the court held the testimony by a preponderance of the credible evidence would meet the standard for the possibility of future risk or the safety or well-being of the victim.

After defendant resolved the criminal charges pending against him, he moved for reconsideration of entry of the FPO claiming he should now be allowed to testify as there was a change in circumstances. Plaintiff opposed the motion. In denying the motion on September 13, 2023, the court determined that the standards for reconsideration had not been met.

On appeal, defendant raises the following contentions : 1) SASPA fails to comport with due process and is unconstitutional; 2) the Family Part judge erred in denying defendant's application to present limited testimony on the possibility of future risk to the safety or well-being of the victim; 3) defendant's motion for reconsideration should have been granted to allow defendant to testify; and 4) plaintiff failed to satisfy both factors required for the issuance of an FPO.

II.

We begin our analysis by acknowledging the foundational legal principles governing this appeal. The scope of our review of Family Part orders is limited.

8

Cesare v. Cesare, 154 N.J. 394, 411 (1998). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). Moreover, "[d]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). A judge's fact-finding is "binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411–12. Accordingly, we will not disturb the factual findings of the trial judge unless they are so "'manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" C.C., 463 N.J. Super. at 428 (quoting S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010)). The judge sees witnesses firsthand and has a "feel of the case that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009). To the extent the trial court's decision implicates questions of law, we independently evaluate those legal rulings de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Prior to the enactment of SASPA in 2016, a victim of sexual violence could only obtain a restraining order under the Prevention of Domestic Violence Act ("PDVA"), N.J.S.A. 2C:25-17 to -25, unless the victim pursued criminal charges, and a restraining order was imposed pursuant to a sentence. The PDVA, however, defines a "victim of domestic violence" as a person who satisfies one of several identified domestic relationships, including a spouse, former spouse, a person with whom the defendant had a child in common, or a person with whom the defendant had a dating relationship. N.J.S.A. 2C:25-19(d). This left a person "subjected to sexual violence in a random encounter or in less than a dating relationship" with no recourse to obtain a restraining order. R.L.U. v. J.P., 457 N.J. Super. 129, 135 (App. Div. 2018). SASPA was intended to fill this gap. Ibid.

Under SASPA,

> Any person alleging to be a victim of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, . . . and who is not eligible for a restraining order as a "victim of domestic violence" as defined by [the PDVA] may . . . file an application with the Superior Court . . . alleging the commission of such conduct or attempted conduct and seeking a temporary protective order.
>
> [N.J.S.A. 2C:14-14(a)1.]

A Superior Court judge can issue an emergency ex parte temporary protective order "when necessary to protect the safety and well-being of an alleged victim . . . ."  N.J.S.A. 2C:14-15a.  The trial court may issue an FPO under N.J.S.A. 2C:14-16a when a plaintiff demonstrates the allegations made in the temporary protective order by a preponderance of the evidence.  The court shall consider, but is not limited, to the following two factors when making its determination:

> (1) the occurrence of one or more acts of nonconsensual sexual contact, sexual penetration, or lewdness, or any attempt at such conduct, against the alleged victim; and
>
> (2) the possibility of future risk to the safety or wellbeing of the alleged victim.
>
> [N.J.S.A. 2C:14-16a.]

A.

Defendant initially argues that SASPA is unconstitutional for two reasons.  First, defendant believes 2C:14-6a(2) should be void for vagueness.  Second, defendant argues that there is a procedural due process violation because defendant had to choose between defending himself in the civil protective order hearing and waiving his Fifth Amendment right against self-incrimination in a potential criminal case.

"[W]henever a challenge is raised to the constitutionality of a statute, there is a strong presumption that the statute is constitutional."  State v. Muhammad,

11                                                        A-0517-23

145 N.J. 23, 41 (1996). This presumption requires a reviewing court to analyze a statute assuming "the legislature acted with existing constitutional law in mind and intended the act to function in a constitutional manner." NYT Cable TV v. Homestead at Mansfield, Inc., 111 N.J. 21, 26 (1988) (Handler, J., concurring) (quoting State v. Profaci, 56 N.J. 346, 349 (1970)).

"A statute or regulation is facially unconstitutional for vagueness if it 'either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application.'" Karins v. Atl. City, 152 N.J. 532, 541 (1998) (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).

In determining whether a statute is vague, "a commonsense approach is appropriate in construing the enactment . . . ." Chez Sez VIII, Inc. v. Poritz, 297 N.J. Super. 331, 351 (App. Div. 1997) (citing SDJ, Inc. v. City of Houston, 837 F.2d 1286, 1278 (5th Cir. 1988)). The language of the statute "should be given its ordinary meaning absent specific intent to the contrary." Mortimer v. Bd. of Review, 99 N.J. 393, 398 (1985). "When examining statutory language for vagueness, the test is whether a person of average intelligence comprehends the meaning of the words." Heyert v. Taddese, 431 N.J. Super. 388, 424 (App. Div. 2013) (citing State v. Afanador, 134 N.J. 162, 171 (1993)). Statutory language

12

should also be considered in the context of the whole act and accorded a common sense meaning that advances the legislative purpose. Voges v. Borough of Tinton Falls, 268 N.J. Super. 279, 285 (App. Div. 1993).

The factor to be considered under N.J.S.A. 2C:14-16a(2), prior to the entry of an FPO, is whether defendant posed a "possibility" of future risk to plaintiff's safety or well-being. Defendant asserts that this factor is unconstitutionally vague, contending the words "possibility," "risk," "safety," and "well-being" require a trial court to engage in a "subjective analysis" of the words' meanings and provide no guidance to the defendant as to how to defend. Moreover, due to their broad definitions, defendant believes the trial court can speculate as to what actions place a victim at risk.

Because the specific words are not defined under SASPA, we turn to their use in the statutory context and their ordinary meaning to ascertain the Legislature's intent. "Risk" is defined as "possibility of loss or injury" or "someone or something that creates or suggests a hazard." Risk, Merriam-Webster, https://www.merriam-webster.com/dictionary/risk (11th ed. 2020). Using the statutory context, a person of average intelligence would comprehend a future "risk" to mean a defendant engaging again in nonconsensual sexual conduct or attempting such conduct against the plaintiff. Thus, the second

13

definition of risk, "something or someone that creates or suggests a hazard," is the proper meaning of "risk" in the context of N.J.S.A. 2C:14-16a(2). As for "safety"[3] and "well-being,"[4] a person of reasonable intelligence can comprehend the ordinary meaning of those words as requiring a finding that a victim would not be safe or "happy, healthy, or prosperous," if he or she was subjected to sexual violence from the defendant. Similarly, the ordinary meaning of "possibility,"[5] of "a chance that something might exist, happen, or be true," is also comprehensible to a person of average intelligence. Because the words employed in N.J.S.A. 2C:14-16a(2) are comprehensible using statutory context and ordinary meaning, the statute is not unconstitutionally vague.

---

[3] "Safety" is defined as "the condition of being safe from undergoing or causing hurt, injury, or loss." Safety, <u>Merriam-Webster Collegiate Dictionary</u>, page # (11th ed. 2020). https://www.merriam-webster.com/dictionary/safety - pg. 149 of the citation guide, § 5.3.5 Dictionaries.

[4] "Well-being" is defined as "the state of being happy, healthy, or prosperous." Well-being, <u>Merriam-Webster Collegiate Dictionary</u>, page # (11th ed. 2020). https://www.merriam-webster.com/dictionary/well-being (11th ed. 2020). - pg. 149 of the citation guide, § 5.3.5 Dictionaries.

[5] "Possibility" is defined as "the condition or fact of being possible." Possibility, <u>Merriam-Webster Collegiate Dictionary</u>, page # (11th ed. 2020). https://www.merriam-webster.com/dictionary/possibility - pg. 149 of the citation guide, § 5.3.5 Dictionaries.

A-0517-23

Defendant also asserts that when it came to proffer his testimony, he had to choose between defending himself in the civil protective order hearing and waiving his Fifth Amendment right against self-incrimination in a potential criminal case. Defendant believes "such a position is untenable and counter to due process and fundamental fairness." This assertion is belied by the plain language of N.J.S.A. 2C:14-16a which reads:

> If a criminal complaint arising out of the same incident which is the subject matter of an application for a protective order has been filed, testimony given by the applicant, the alleged victim, or the respondent in accordance with an application filed pursuant to this section shall not be used in the criminal proceeding against the respondent, other than contempt matters, and where it would otherwise be admissible hearsay under the rules of evidence that govern when a party is unavailable.

The record clearly shows defendant voluntarily chose not to testify at the protective order trial while he was represented by counsel. The record confirms he did not seek to adjourn the hearing pending the resolution of the related criminal charges. Moreover, if he chose to testify, under the statute his testimony could not have been used in the criminal proceeding.

A-0517-23

B.

Defendant next argues that the Family Part judge erred in denying his application to present limited testimony solely on the possibility of future risk to the safety or well-being of the victim.

"Ordinarily the scope of cross-examination of a witness rests in the discretion of the trial judge, and an appellate court will not interfere with the control thereof by him unless clear error and prejudice is shown." Janus v. Hackensack Hosp., 131 N.J. Super. 535, 540 (App. Div. 1974) (citation omitted). "Specifically, it has been held that the control of a cross-examination solely tending to test the credibility and trustworthiness of a witness rests in the sound discretion of the trial judge, subject only to the consequence of its abuse." Id. at 540-41 (citing State v. Bartell, 15 N.J. Super. 450, 455 (App.Div.1951), aff'd 10 N.J. 9 (1952)). Moreover, the court exercises "control over the mode and order of interrogating witnesses and presenting evidence to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment and undue embarrassment." N.J.R.E. 611(a).

Here, there is no clear error in the trial court's decision to refuse to limit appellant's proposed testimony to the second prong of N.J.S.A. 2C:14-16a. Because our scope of review is limited to clear error, it is not our place to

16

second-guess the judge's decision to refuse to limit appellant's testimony to the second prong. Defendant was not prevented from testifying, instead, the judge refused to limit his testimony and prevent opposing counsel from being able to cross-examine him as to credibility, motivation, and other aspects of his proposed testimony.

## C.

Defendant also posits that under Rule 1:7-4, Rule 4:49-1, Rule 4:49-2 and Rule 4:50-1, his motion for reconsideration should have been granted to allow him to testify after his criminal matter was resolved.

First, we review defendant's motion under Rule 4:50-1(b), which permits a court to relieve a party from a final judgment based upon "newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under [Rule] 4:49."

"Courts should use Rule 4:50-1 sparingly, in exceptional situations," in order to prevent "a grave injustice . . . ." Hous. Auth. of Morristown v. Little, 135 N.J. 274, 289 (1994). Rule 4:50-1 is "'designed to reconcile the strong interests in finality of judgments and judicial efficiency with the equitable notion that courts should have authority to avoid an unjust result in any given

case.'"  Triffin v. Maryland Child Support Enf't Admin., 436 N.J. Super. 621, 629 (App. Div. 2014) (quoting Mancini v. EDS ex rel. N.J. Auto. Full Ins. Underwriting Ass'n, 132 N.J. 330, 334 (1993)).  "The trial court's determination under the rule warrants substantial deference and should not be reversed unless it results in a clear abuse of discretion."  U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012).  Abuse of discretion occurs where a decision is "'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  Ibid. (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007)).

To prevail under Rule 4:50-1(b), the moving party must show "'that the evidence would probably have changed the result, that it was unobtainable by the exercise of due diligence for use at the trial, and that the evidence was not merely cumulative.'"  DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 264 (2009) (quoting Quick Chek Food Stores v. Twp. of Springfield, 83 N.J. 438, 445 (1980)).  The party seeking relief must satisfy all three requirements.  Ibid. Moreover, this category of newly discovered evidence "does not include an attempt to remedy a belated realization of the inaccuracy of an adversary's proofs."  Ibid.  Again, defendant had the opportunity to testify at trial, but with counsel, waived his right.

We are satisfied that defendant did not make an explicit showing of the three requirements under Rule 4:50-1(b). We accord substantial deference to the trial judge's factual findings. C.C., 463 N.J. Super. at 428. Moreover, his findings are supported by the evidence in the record, and there is no indication that he abused his discretion. Accordingly, defendant has failed to establish a basis to overturn the denial of his motion.

We turn next to defendant's contention the trial court erred in denying his motion for reconsideration. Once again, the scope of our review is limited. See Brunt v. Bd. of Trs., Police & Firemen's Ret. Sys., 455 N.J. Super. 357, 362 (App. Div. 2018). "[A] motion for reconsideration 'is not properly brought simply because a litigant is dissatisfied with a judge's decision, nor is it an appropriate vehicle to supplement an inadequate record.'" Guido v. Duane Morris LLP, 202 N.J. 79, 87 (2010) (internal citation omitted). Rather, a motion for reconsideration "is primarily an opportunity to seek to convince the court that either: 1) it has expressed its decision based upon a palpably incorrect or irrational basis; or 2) it is obvious that the court either did not consider, or failed to appreciate the significance of probative, competent evidence." Id. at 87–88. "We will not disturb the trial court's reconsideration decision 'unless it

19

represents a clear abuse of discretion.'" Kornbleuth v. Westover, 241 N.J. 289, 301 (2020) (quoting Hous. Auth. of Morristown, 135 N.J. at 283).

At the reconsideration motion hearing, defendant's argument was to allow defendant to testify at this point, reasoning that the "newly discovered evidence" provided a basis upon which the court could reevaluate the two elements that plaintiff needed to prove. The trial court rejected that argument, finding that defendant voluntarily waived his right to testify and to "now say I would like to testify is not something that would meet a reconsideration standard . . . ." The trial court also rejected defendant's argument that he should be given a rehearing because he had been prohibited from testifying at the trial. Defendant has thus failed to show that the trial court's decision was "based upon a palpably incorrect or irrational basis" or that the trial court "either did not consider, or failed to appreciate the significance of probative, competent evidence." Westover, 241 N.J. at 301. Nor has defendant established that the trial court otherwise abused its discretion in denying his motion for reconsideration. See Ibid.

D.

We need only briefly address defendant's contention plaintiff failed to satisfy both factors required for the issuance of an FPO. In order, considering the first factor, we are satisfied the trial court's finding that defendant engaged

in nonconsensual sexual penetration with plaintiff was supported with "adequate, substantial, credible evidence." Cesare, 154 N.J. at 412. The trial judge found plaintiff credible. Her testimony satisfies N.J.S.A. 2C:14-16a(1). Therefore, she established a predicate act.

The second factor to be considered under N.J.S.A. 2C:14-16a(2), whether defendant posed a "possibility" of future risk to plaintiff's safety or well-being was also satisfied. In his analysis, the judge considered plaintiff's trauma from the incident and credible testimony. The court determined an FPO was necessary as there was a risk to plaintiff's safety and well-being because of her concern that she could come across defendant in the future. Under the totality of the circumstances present here, and the deference we accord to the Family Part judge's credibility assessment of the parties and witnesses, as well as his fact findings, we affirm the entry of an FPO because we are satisfied the trial court applied the plain meaning of the statute.

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21