672 A.2d 247

CHARLES DaGRACA, JR. AND BARBARA DaGRACA, HIS WIFE, PLAINTIFFS–APPELLANTS, v. EARL LAING, M.D., DEFENDANT, AND KEVIN BELL, M.D., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted February 6, 1996—Decided March 14, 1996.

Before Judges MICHELS, BAIME and VILLANUEVA.

*Ravich, Koster, Tobin, Oleckna, Reitman & Greenstein,* attorneys for appellants (*Roy J. Konray,* of counsel and on the brief).

*Hurley & Vasios,* attorneys for respondent (*Leonard Rosenstein,* of counsel and on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Plaintiffs Charles DaGraca, Jr. and his wife Barbara DaGraca appeal from a judgment of the Law Division entered in favor of defendant Kevin Bell, M.D. (Dr. Bell) and from a denial of their motion for a new trial in this medical malpractice action.

The pertinent facts underlying the issues raised on appeal are easily summarized. On February 26, 1991, plaintiff Charles DaGraca, Jr., was admitted to Overlook Hospital (Overlook) after falling in his driveway. Plaintiff came under the care of Dr. Bell, his family physician, who had treated plaintiff for several years. Dr. Bell, in treating plaintiff for a pre-existing panic disorder, had prescribed a medication called Xanax for plaintiff from 1988 up until the time of his admission to Overlook in 1991. Upon plaintiff's admission to Overlook, Dr. Bell ordered that Xanax be discontinued. On March 5, 1991, after examining plaintiff, Dr.

Bell believed that the symptoms exhibited by plaintiff were caused by either withdrawal from Demerol, or an adverse reaction to Proventil, two medications which had been prescribed for plaintiff. Dr. Bell discontinued the Proventil, as well as all other medication.

On March 5, 1991, plaintiff was examined by Dr. Laing, a psychiatrist called by Dr. Bell for consultation. Dr. Laing was aware of plaintiff's prior use of Xanax and that Xanax as well as all other medications had been discontinued by Dr. Bell. Dr. Laing also knew that plaintiff was disoriented and made a "differential diagnosis" that plaintiff's condition was not a primary psychiatric disorder but most likely a reaction to Proventil and less likely a withdrawal from Xanax. Dr. Laing, therefore, concurred that plaintiff's medications should be discontinued. On March 6, 1991, Dr. Laing examined plaintiff again and noted that plaintiff, while still confused, was somewhat improved and ready for discharge. He recommended that plaintiff remain off the medications.

On March 7, 1991, plaintiff's condition worsened, and he eventually developed neuroleptic malignant syndrome, seizures and a long series of medical problems, including brain damage.

Plaintiff instituted this action against Dr. Bell and Dr. Laing to recover damages for the personal injuries he sustained as a result of their alleged professional negligence/medical malpractice. Plaintiff's wife sued *per quod* for her loss of services and consortium. Plaintiffs charged that the abrupt cessation of Xanax had the potential to cause reactions including but not limited to anxiety, insomnia, seizures and death and that in ordering its cessation without tapering the dosage, Dr. Bell deviated from accepted medical standards in his treatment. Plaintiffs further charged that Dr. Bell negligently failed to recognize the symptoms of Xanax withdrawal exhibited by plaintiff prior to March 5, 1991, when Dr. Bell discontinued the medication. Plaintiffs also charged Dr. Laing with professional negligence/medical malpractice in failing to recognize the symptoms of plaintiff's Xanax withdrawal and in prescribing a medication called Haldol.

At the conclusion of the proofs, the jury found that neither Dr. Laing nor Dr. Bell was negligent in the treatment of plaintiff and a judgment of no cause of action was entered accordingly in favor of both doctors. Plaintiffs' motion for a judgment notwithstanding the verdict or, alternatively, a new trial solely with respect to Dr. Bell was denied. This appeal followed.[1]

Plaintiffs seek a reversal of the judgment and a new trial against Dr. Bell only, contending that (1) the trial court erred in precluding them (a) from using any portion of a learned treatise to cross-examine a defense expert and (b) from cross-examining Dr. Bell with respect to both his failure to record plaintiff's last seven Xanax prescriptions in his office records and his decision to give these prescriptions over the telephone, without the benefit of an office visit; and (2) the verdict in favor of Dr. Bell was against the weight of the evidence.

We are satisfied that the trial court's evidential rulings challenged on appeal were erroneous and require a reversal of the judgment and a remand for a new trial with respect to Dr. Bell only.

## I.

The trial court improperly precluded plaintiffs from using portions of a learned treatise entitled *Benzodiazepine Dependence, Toxicity, and Abuse: A Task Force Report of the Ameri-*

---

[1] During the course of trial, plaintiffs and Dr. Laing entered into a so-called "high-low" settlement agreement. The agreement provided that "the least Dr. Laing will pay, irrespective of any jury verdict, is $250,000, without interest, prejudgment or postjudgment, [and] without costs." The agreement further provided that "[t]he most he will have to pay, irrespective of any verdict, is $750,000, without interest, pre or postjudgment, and without costs." Because of this so-called "high-low" settlement agreement, plaintiffs have not appealed the judgment in favor of Dr. Laing. We note this arrangement simply to enable the reader to understand why this appeal names only Dr. Bell. The reader should not interpret our recitation as placing the imprimatur of the court on these so-called "high-low" settlement agreements. The propriety of such agreements is not before this court.

*can Psychiatric Association,* (Task Force Report), to cross-examine defendant Laing's expert witness other than those portions read into evidence by plaintiffs' own medical expert. Plaintiffs' medical expert, Dr. Latimer, a psychiatrist, testified that the Task Force Report was considered to be a reliable authority by the medical community, and that he considered it to be a reliable authority.

However, Dr. Kiev, a defense psychiatrist, when questioned regarding a portion of the Task Force Report testified that certain conclusions reached in the report were not credible. Dr. Kiev testified that the studies cited in the articles upon which the Task Force Report is based "are not based on empirical scientific investigations prospectively where we can definitively say this is the fact." Dr. Kiev admitted, however, that he had not read the whole report, but had only read a summary of it. Dr. Kiev further testified about two separate studies which had employed a "controlled sample" in which it was found that the dose of Xanax "had to be for an extended period of time, have to be more than four milligrams to begin to get some of the symptoms and in general, they occurred within the first two, [or] three days." Dr. Kiev opined that these "double-blind prospective stud[ies] [are] more reliable than a retrospective study."

Plaintiffs then attempted to cross-examine Dr. Kiev on a portion of the Task Force Report. Defendant objected, arguing that plaintiffs' line of questioning was not relevant and that the portion about which plaintiffs were questioning the expert "was never read in[.]" The trial court sustained the objection, ruling that "if it's not read to the jury, it's not evidence in the case." The trial court ruled that plaintiffs could "cross-examine if the book is qualified for cross-examination. You'll have to lay a foundation." Plaintiffs asked Dr. Kiev whether he considered the Task Force Report to be a reliable authority and Dr. Kiev responded in the negative. The trial court thereupon sustained the objection and precluded the cross-examination of Dr. Kiev on the challenged portions of the report.

The trial court's ruling in this regard is plainly incorrect and violates the learned-treatise rule announced by our Supreme Court in *Jacober v. St. Peter's Medical Ctr.*, 128 *N.J.* 475, 498, 608 *A.*2d 304 *recons. granted*, 130 *N.J.* 586, 617 *A.*2d 1213 (1992), and later codified in *N.J.R.E.* 803(c)(18). In *Jacober, supra*, 128 *N.J.* at 498, 608 *A.*2d 304, the Court substantially adopted *Fed.R.Evid.* 803(18) as the new rule of evidence regarding the admission of learned treatises in New Jersey, and applied it to the parties in the *Jacober* case and prospectively thereafter. The Court effectively modified the former rule of *Ruth v. Fenchel*, 21 *N.J.* 171, 176, 121 *A.*2d 373 (1956), that permitted the use of a learned treatise for impeachment of a witness only when that witness recognized the treatise as authoritative.

The Court in *Jacober, supra*, 128 *N.J.* at 489–90, 608 *A.*2d 304, explained that this new learned-treatise rule "allows texts to be established as reliable authority by experts other than the cross-examined expert, as well as by judicial notice." In so doing, "the rule 'avoid[s] the possibility that the expert may at the outset block cross-examination by refusing to concede reliance or authoritativeness.'" *Id.* at 490, 608 *A.*2d 304 (quoting *Fed.R.Evid.* 803(18) advisory committee's note). The Court noted that "several state courts permit cross-examiners to establish the authority of learned treatises through judicial notice or through the testimony of other expert witnesses." *Id.* at 490, 608 *A.*2d 304; *see, e.g., Darling v. Charleston Community Memorial Hosp.*, 33 *Ill.*2d 326, 336, 211 *N.E.*2d 253, 259 (1965), *cert. denied*, 383 *U.S.* 946, 86 *S.Ct.* 1204, 16 *L.Ed.*2d 209 (1966); *Jones v. Bloom*, 388 *Mich.* 98, 118, 200 *N.W.*2d 196, 206 (1972); *Iverson v. Lancaster*, 158 *N.W.*2d 507, 517–18 (N.D.1968); *Dabroe v. Rhodes Co.*, 64 *Wash.*2d 431, 438–39, 392 *P.*2d 317, 321–23 (1964); *Thornton v. CAMC, Etc.*, 172 *W.Va.* 360, 364–65, 305 *S.E.*2d 316, 321–23 (1983); *see also* Biunno, *Current N.J. Rules of Evidence, Rule* 705, Comment 3 at 721 (1995).

Moreover, the Court noted that "[i]n contrast to the *Ruth* doctrine, [*Fed.R.Evid.*] 803(18) permits learned-treatise state-

ments to be admitted as substantive evidence on both direct and cross-examination." *Jacober, supra,* 128 *N.J.* at 491, 608 *A.*2d 304. However, the Court noted that "the rule 'limit[s] the use of treatises as substantive evidence to situations in which an expert is on the stand and available to explain and assist in the application of the treatise if desired.'" *Id.* at 491, 608 *A.*2d 304 (quoting *Fed.R.Evid.* 803(18) advisory committee's note).

The Court held that under the new learned-treatise rule, "a text will qualify as a 'reliable authority' if it represents the type of material reasonably relied on by experts in the field." *Id.* at 495, 608 *A.*2d 304; *see also Rubanick v. Witco Chemical Corp.,* 125 *N.J.* 421, 449–53, 593 *A.*2d 733 (1991); *Ryan v. KDI Sylvan Pools, Inc.,* 121 *N.J.* 276, 287, 579 *A.*2d 1241 (1990). The Court explained that "in determining reliability '[t]he focus should be on what the experts in fact rely on, not on whether the court thinks they should so rely.'" *Jacober, supra,* 128 *N.J.* at 495–96, 608 *A.*2d 304 (quoting *Ryan, supra,* 121 *N.J.* at 289, 579 *A.*2d 1241). The Court further instructed that "[w]hen a text's reliability is in doubt, trial courts should conduct *Rule* 8 hearings, either before or during trial, to determine whether the text qualifies as a learned treatise." *Id.* at 496, 608 *A.*2d 304.

In enunciating this new learned-treatise rule, the Court acknowledged that " '[i]t certainly is illogical, if not actually unfair, to permit witnesses to give expert opinions based on book knowledge, and then deprive the party challenging such evidence of all opportunity to interrogate them about divergent opinions expressed in other reputable books.'" *Id.* at 494–95, 608 *A.*2d 304 (quoting *Reilly v. Pinkus,* 338 *U.S.* 269, 275, 70 *S.Ct.* 110, 113, 94 *L.Ed.* 63, 70 (1949)).

*N.J.R.E.* 803 enumerates those statements that are not excluded by the hearsay rule. Subsection *N.J.R.E.* 803(c)(18), which became effective July 1, 1993 pursuant to the rule adoption provisions of *N.J.S.A.* 2A:84A–36, provides:

To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert in direct examination, statements contained in published

treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by testimony or by judicial notice. If admitted, the statements may not be received as exhibits but may be read into evidence or, if graphics, shown to the jury.

The 1991 Supreme Court Committee Comment to *N.J.R.E.* 803(c)(18) notes that "[t]he adoption of this rule represents a change in practice by allowing the use of learned treatise evidence even if an expert witness fails to acknowledge that it is authoritative, so long as the reliability of the authority is established by other testimony or by judicial notice." Biunno, *Current N.J. Rules of Evidence,* Rule 803(c)(18) at 821 (1995).

Here, plaintiffs' expert, Dr. Latimer, testified that the Task Force Report was considered a reliable authority by the medical community, and that he believed it to be a reliable authority. Consequently, the trial court erred in precluding plaintiffs from cross-examining Dr. Kiev on portions of that report, even though those portions were not read into evidence by plaintiffs' expert or acknowledged by Dr. Kiev as being authoritative. In our view, this error had a clear capability to produce an unjust result, mandating the reversal of the judgment in favor of Dr. Bell.

## II.

We are also satisfied that the trial court committed reversible error by virtue of its refusal to permit plaintiffs to cross-examine Dr. Bell on his failure to record plaintiff's last seven Xanax prescriptions in his office records and his decision to issue those prescriptions over the telephone, without the benefit of an office visit.

In the seven months prior to plaintiff's February 26, 1991 admission to Overlook, Dr. Bell prescribed Xanax for plaintiff seven times. Plaintiff claims that Dr. Bell did not actually see him at any time when he issued the seven Xanax prescriptions and that Dr. Bell failed to record those prescriptions in his office records. Plaintiffs attempted to cross-examine Dr. Bell regarding these seven prescriptions, but Dr. Bell objected on the ground

that his recordkeeping was not at issue in the case. The trial court sustained the objection, reasoning:

> It seems to me the thrust is his record-keeping; and under Rule 403 analysis, I think the substantial prejudice in introducing the question of the manner in which he keeps his office records which would divert the jury from the true issues in the case overwhelms any possible probative value.

We disagree.

*N.J.R.E.* 403 provides:

> Except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.

It is well settled that "[w]hether the probative value of a particular piece of evidence is outweighed by the risk that its admission will either (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice is a decision normally left to the discretion of the trial judge and this discretion is a broad one." *Tonsberg v. VIP Coach Lines, Inc.,* 216 *N.J.Super.* 522, 530, 524 *A.*2d 460 (App.Div.1987); *see also State v. Balthrop,* 92 *N.J.* 542, 544, 457 *A.*2d 1152 (1983). It is also settled that "extensive cross-examination of experts is generally permitted, subject to reasonable limitations imposed by the trial court in its discretion." *Nowacki v. Community Medical Ctr.,* 279 *N.J.Super.* 276, 290, 652 *A.*2d 758 (App.Div.), *certif. denied,* 141 *N.J.* 95, 660 *A.*2d 1194 (1995). Moreover, in reviewing the trial court's decision to limit cross-examination, we will not interfere with the exercise of the trial court's discretion "unless clear error and prejudice are shown." *Glenpointe Assocs. v. Tp. of Teaneck,* 241 *N.J.Super.* 37, 54, 574 *A.*2d 459 (App.Div.), *certif. denied,* 122 *N.J.* 391, 585 *A.*2d 392 (1990); *see also State v. Martini,* 131 *N.J.* 176, 263–64, 619 *A.*2d 1208 (1993), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995); *State v. Long,* 119 *N.J.* 439, 501, 575 *A.*2d 435 (1990); *Gaido v. Weiser,* 227 *N.J.Super.* 175, 189, 545 *A.*2d 1350 (App.Div.1988), *aff'd,* 115 *N.J.* 310, 558 *A.*2d 845 (1989); *Amaru v. Stratton,* 209 *N.J.Super.* 1, 13, 506 *A.*2d 1225 (App.Div. 1985); *Janus v. Hackensack Hosp.,* 131 *N.J.Super.* 535, 540–41, 330 *A.*2d 628 (App.Div.1974), *certif. denied,* 67 *N.J.* 95, 335 *A.*2d 47

(1975); *Cestero v. Ferrara,* 110 *N.J.Super.* 264, 273–74, 265 *A.2d* 387 (App.Div.1970), *aff'd,* 57 *N.J.* 497, 273 *A.*2d 761 (1971); *Mazza v. Winters,* 95 *N.J.Super.* 71, 78, 230 *A.*2d 139 (App.Div.1967); *Lawlor v. Kolarsick,* 92 *N.J.Super.* 309, 311, 223 *A.*2d 281 (App. Div.), *certif. denied,* 48 *N.J.* 356, 225 *A.*2d 367 (1966). In this regard, we recognize, of course, that "the scope of the cross-examination must be tailored to preserve fairness and prevent undue prejudice." *State v. Medina,* 254 *N.J.Super.* 668, 680, 604 *A.*2d 197 (App.Div.1992).

■ Here, the trial court erred in limiting the cross-examination of Dr. Bell concerning his failure to note in his records the seven Xanax prescriptions and whether those prescriptions were issued over the telephone and without the benefit of office visits. This cross-examination plainly went to the issue of whether Dr. Bell had forgotten that he prescribed Xanax for plaintiff and plaintiffs should have been permitted to explore this issue before the jury.

## III.

Accordingly, the judgment under review is reversed and the matter remanded for a new trial as to Dr. Bell only. Since we have reversed the judgment and remanded the matter for a new trial, we do not reach the issue of whether the verdict in favor of Dr. Bell was against the weight of the evidence.