**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4196-18T1

MARTA LUKACS and
FRANK P. LUKACS,

     Plaintiffs-Appellants,

v.

HIGHTSTOWN MEDICAL
ASSOCIATES, HANK R. LUBIN,
M.D. and VALERIE A. LAYNE, D.N.P.,

     Defendants-Respondents.

_____

Submitted November 2, 2020 – Decided  January 13, 2021

Before Judges Fasciale and Rothstadt.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-8095-13.

Frank P. Lukacs, appellant pro se.

Buckley Theroux Kline & Cooley, LLC, attorneys for respondents Hightstown Medical Associates and Hank R. Lubin, M.D. (William G. Theroux, of counsel; Sheila Murugan, on the brief).

PER CURIAM

Plaintiff Frank Lukacs and his late wife, Marta Lukacs[1] filed a complaint for damages arising from what they alleged was the professional negligence of defendants Hightstown Medical Associates (Hightstown), Dr. Hank R. Lubin, and D.N.P. Valerie Layne, based upon their failure to properly diagnose and treat Marta[2] with having Bordetella Pertussis (BP), commonly known as whooping cough. Plaintiff appeals from the trial judge's order granting defendants' Rule 4:40-1 motion made at the close of plaintiff's case, dismissing his complaint. The trial judge granted defendants' motion after finding that plaintiff failed to make a prima facie showing that defendants had deviated from a professional standard of care that caused Marta to suffer damages arising from injuries she allegedly sustained due to defendants' negligence.

On appeal, plaintiff challenges the trial judge's rulings regarding his attempt to admit into evidence forty-two publications he deemed to be "learned treatises," and about his request to read to the jury from his late wife's deposition and answers to interrogatories. He also raises a constitutional challenge to the Patient First Act, N.J.S.A. 2A:53A-37 to -42.

---

[1] She died on July 13, 2018, about nine months before the trial in this matter.

[2] We refer to the late Mrs. Lukacs by her first name to avoid any confusion arising from her and her husband's common last name.

A-4196-18T1

We affirm, as plaintiff failed to argue why the trial judge's order dismissing the complaint was erroneous and because we find no merit to plaintiff's contentions about the judge's evidentiary rulings, including those limiting the number of learned treatises that could be admitted, or his challenge to the Patients First Act.

I.

A.

Our review of a trial judge's decision on a motion for judgment is de novo, adhering to the same standard as that applied by the trial judge. Lechler v. 303 Sunset Ave. Condo. Ass'n, 452 N.J. Super. 574, 582 (App. Div. 2017) (citing Frugis v. Bracigliano, 177 N.J. 250, 269 (2003)). In our review, we "accept[] as true all the evidence which supports the position of the party defending against the motion and accord[ that party] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, [and if] reasonable minds could differ [as to the outcome], the motion must be denied." Verdicchio v. Ricca, 179 N.J. 1, 30 (2004). In reaching our conclusion we do not "consider 'the worth, nature or extent (beyond a scintilla) of the evidence,' but only review 'its existence, viewed most favorably to the party opposing the motion.'"

A-4196-18T1

Lechler, 452 N.J. Super. at 582 (quoting Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969)).

B.

Applying that standard, we summarize the facts developed from the record as follows. On December 28, 2011, Marta presented to Hightstown with symptoms that included a nasal drip, scratchy throat, and dry cough. She was evaluated by Layne, who diagnosed her with having an upper respiratory infection. Layne directed that she continue taking over-the-counter medications, as Marta indicated she had been, and provided Marta with a prescription for a cough suppressant. Marta went home but returned on January 3, 2012, still not feeling any better.

At her January 3 visit, Marta was evaluated by Lubin, who also diagnosed her with an upper respiratory infection along with a cough and unspecified fever. Lubin believed plaintiff's illness could be viral. The doctor ordered bloodwork and a chest x-ray, the results of which were within normal parameters. The doctor concluded the infection was viral and did not prescribe any medication. Marta returned home that day.

On January 9, 2012, Marta was taken by ambulance to the emergency room at a hospital. There, she tested positive for BP and began treatment. Over

4

the course of the following months, Marta recovered from her whooping cough but continued to suffer from a number of ailments she claimed had developed while she was dealing with the illness. Her recovery continued until May 30, 2012, when a doctor noted that Marta was "well-nourished," "well-developed and in no apparent distress."

## C.

Plaintiff and his late wife filed their complaint for negligence on December 20, 2013, seeking $60,000 in damages for medical expenses and lost wages stemming from defendants' failure to correctly diagnose and treat Marta. Defendants filed timely responses and the parties thereafter engaged in discovery.

During discovery, plaintiff retained three medical experts, Dr. Mark Levin, Dr. Raven Wentworth, and Dr. Harry Jackson, who all produced medical expert reports and who were each deposed. In their depositions, the doctors were presented with various publications and related materials that they verified were reliable materials regarding the diagnosis and treatment of patients.

The trial was scheduled for April 8, 2019. Before trial, plaintiff filed several unsuccessful motions to have forty-two documents qualified as learned treatises so that they could be read to the jury without the need to call an expert

A-4196-18T1

witness.[3]  Thereafter, on February 19, 2019, he filed another motion seeking a determination that the documents were admissible as learned treatises under N.J.R.E. 803(c)(18) based on his experts' verification of their reliability at their depositions.

In denying the February 19 motion, the motion judge noted that it was clear that plaintiff did not intend to call expert witnesses at trial because of the high cost of doing so, and instead sought to use his experts' deposition testimony to establish that the forty-two articles were learned treatises.  However, although the judge had requested the deposition transcripts of each of plaintiff's experts, plaintiff provided only an excerpt from Levin's deposition, in which the doctor agreed that each treatise was reliable.

The motion judge concluded that plaintiff's efforts to qualify the articles as learned treaties were insufficient.  He ruled that in order to qualify the documents, plaintiff would need to have Levin appear at trial so the trial judge could make a determination at a Rule 104 hearing as to whether the materials constituted reliable authority and whether plaintiff would be able to read them to the jury without an expert testifying.  Finally, the judge concluded that he

---

[3] As it turned out, plaintiff did not originally intend to call any expert witnesses at trial.  Instead he planned on using their deposition testimony and reading to the jury from the alleged learned treatises to establish defendants' liability.

could not qualify the documents as reliable authority by way of judicial notice under N.J.R.E 201(b)(3), as also requested by plaintiff, because plaintiff had not provided the judge with enough information to make that determination, especially since plaintiff did not provide the forty-two articles.

As contemplated by the motion judge, on April 4, 2019, prior to trial, the trial judge held a Rule 104 hearing to determine which, if any, of the forty-two articles, textbooks, webpages, and documents that plaintiff claimed Levin relied upon in reaching the conclusions to which he was going to testify could be qualified as "learned treatises." At the hearing, Levin testified that he relied on all of the forty-two articles in equal but different ways, and that he premised his stipulation to the articles' being learned treatises upon his application of the definition of a learned treatise provided to him by plaintiff.[4]

---

[4] The exact language of the definition of a "learned treatise" given to Levin is unclear from the record. Levin testified that he premised his stipulation on the definition of a learned treatise "in the New Jersey State law," as well as in an "article by Brown." The Brown "article" presumably refers to an excerpt from Abbot S. Brown, New Jersey Medical Malpractice Law (2015) titled "Treatises." The record contains a copy of the "article" with highlighted phrases including: "stipulate that the treatises were 'authoritative,'" "standard texts," "a standard text book," "an expert to recognize text as a standard authority," "the type of material reasonably relied on by experts in the field," and "regarded by professionals in the field as trustworthy." Based on the fact that plaintiff's experts stipulated to the articles being "'authoritative,' 'standard texts' or 'standard textbooks,' 'standard authority,' 'the type of material reasonably relied

However, Levin also testified that the first of his two reports did not cite or refer to any learned treatise. Rather, the only authority expressly cited to, was a webpage published by the Center for Disease Control (CDC) listing guidelines for the control of BP outbreaks. As to his second report, Levin confirmed that it did not include a reference to any of the forty-two proposed learned treatises. Nevertheless, on direct examination, Levin indicated that he used at least thirty-nine of the would-be treatises in confirming his opinions he based on his "general medical knowledge," even though his reports did not make any reference to them, other than the CDC guidelines.

After considering Levin's testimony, the judge permitted plaintiff to utilize six of the forty-two documents at trial as learned treatises "based on [Levin]'s testimony in terms of . . . overlap . . . of different areas . . . that he identified." The trial judge made clear that experts could not simply identify documents as learned treatises, but they also had to explain why and how they relied upon them in formulating their opinions. Notwithstanding the fact that Levin failed to demonstrate how he relied on the documents in forming his

on by experts in the field,' 'regarded by professionals in the field as trustworthy,' 'reliable authority,' and . . . 'representative of the type of research material relied upon by experts in the field,'" in their reports and depositions, it is reasonable to conclude that this was the definition provided by plaintiff.

A-4196-18T1

opinion, the trial judge agreed to admit the six treatises based on Levin's testimony regarding how each treatise related to his opinion with respect to "deviation from [the] standard of care, review of clinical information, causation and damages."

The judge did not select all six articles that plaintiff would be permitted to use. Instead, the judge stated that plaintiff was permitted to use four specific articles and to select one more from a group of four others, and a last one from a group of six other documents.

## D.

At trial, Levin was the only expert to testify on plaintiff's behalf.[5] Prior to his testimony, during plaintiff's qualification of Levin as an expert, the trial judge rejected a request by plaintiff to allow Levin to read to the jury from the expert reports issued by the two non-testifying experts, Wentworth and Jackson.

---

[5] Before the beginning of the trial, it was established that Wentworth and Jackson would not be appearing on plaintiff's behalf. Wentworth was not being called and Jackson was ill. At the end of plaintiff's case, plaintiff rested. The next day, plaintiff asked the trial judge to allow Jackson to testify. Defendants objected claiming surprise and noting that plaintiff had rested, and they were prepared to move for dismissal and, if unsuccessful, to call their expert to testify. The judge denied plaintiff's request.

A-4196-18T1

The judge stated Levin could not "sign I agree with someone else's report" and "get to use their report," and explained that "[h]e has to testify as to his opinion."

Levin testified that the symptoms Marta presented with upon her December 28, 2011 visit to Hightstown should have been indicative of whooping cough—which a blood test or a swab could have been ordered to identify—and antibiotics should have been prescribed on that date. For that reason, Layne deviated from the accepted standard of care during Marta's visit to Hightstown on December 28, 2011. Levin also testified that Marta's clinical presentation during her January 3, 2012 visit to Hightstown was typical of BP and that antibiotic therapy should have been initiated on that date. For that reason, Lubin deviated from the accepted standard of care on January 3, 2012. He also testified that defendants' alleged negligence in failing to accurately diagnose Marta resulted in her illness lasting three to four days longer than if antibiotics had been timely administered upon her visits to Hightstown.

However, when questioned about the prevalence of viral upper respiratory infections—which was both Layne's and Lubin's ultimate diagnosis of Marta's symptoms—Levin agreed that millions of patients develop such illnesses in the United States each year. He also agreed that viral upper respiratory infections were "one of the most common problems for which patients see primary care

physicians" and that "the majority of upper respiratory infections in the fall and winter are viral in nature." Moreover, based on the literature, it was Levin's opinion that although there were over a million cases of BP in the United States in 2011, only twenty thousand were diagnosed.

Reading from the New England Journal of Medicine, Levin testified that the risk factors of BP "included adolescent age, an absence of fever, and a prolonged duration of cough." On cross-examination, Levin agreed that, based on the New England Journal of Medicine, BP accounted for only 0.7% to 5.7% of episodes involving illnesses with symptoms such as the ones Marta had. He also agreed that between seventy-five and ninety percent of patients with a prolonged cough do not have BP.

Levin further testified that upper respiratory infections can cause nasal congestion, nasal discharge, postnasal drip, scratchy throat, hoarseness, ear pressure, sinus pain and pressure, fever, and a productive cough. He also agreed that, while signs of BP can be non-specific to that illness, the symptoms that commonly accompany viral upper respiratory infections were the same symptoms Marta complained of upon her visits to Hightstown.

As to his testimony about Lubin being required to administer antibiotics during Marta's January 3, 2012 visit to Hightstown, Levin conceded that a

patient who receives antibiotics unnecessarily can be exposed to preventable and sometimes serious health risks and that one potential risk is that prescribing antibiotics could result in a patient developing C-difficile—a potentially life-threatening condition. Levin acknowledged that Marta had a history of developing C-difficile following antibiotic use.

Further, Levin acknowledged that the CDC takes the position that antibiotics should only be prescribed when necessary in order to minimize the risk of antibiotic resistance and that physicians need to utilize their judgment in making a diagnosis. He further testified that individuals with BP usually recover without antibiotics. Levin also stated that antibiotics do not typically alter a patient's clinical course when given after the catarrhal phase which lasts several days to one week.[6]

Levin also acknowledged that when Marta presented to Lubin at Hightstown, she stated that she had been suffering with her symptoms for two weeks. While Levin also stated that testing for BP when a patient presented

---

[6] The catarrhal stage refers to the first five to ten days of BP's clinical course, during which the patient will have mild symptoms "indistinguishable from those of minor respiratory tract infections." Pertussis (Whooping Cough), Clinical Features, CDC, https://www.cdc.gov/pertussis/clinical/features.html (last visited Dec. 15, 2020).

with symptoms as Marta did was required under the applicable standard of care, he conceded that "he [had] seen thousands of patients with a cough that lasted over five days," and that he personally has tested for BP only six times and diagnosed three cases of whooping cough in adults.

According to Levin, had Marta been treated for BP upon her visit to Hightstown, she would not have developed a subsequent infection resulting in mycoplasma pneumonia.[7] But, on cross-examination, Levin admitted that Marta had a history of mycoplasma pneumonia, and that not every patient who has BP will develop this infection. Further, he testified that he had not seen any record indicating that Marta had been diagnosed with any form of pneumonia among the medical records pertaining to the time period relevant to plaintiff's claims.

Levin also conceded that Marta's medical records revealed that Lubin ordered a chest x-ray, which demonstrated that her lungs were clear. He further agreed that Lubin appropriately ordered a complete blood count, which ultimately showed that Marta's white blood cell count was within normal limits

---

[7] This type of pneumonia is commonly referred to as "walking pneumonia" or "atypical pneumonia," and is caused by a specific type of bacteria that causes inflammation to the lungs but tends to be "milder than pneumonia caused by other germs." Mycoplasma Pneumonia Infections, CDC, https://www.cdc.gov/pneumonia/atypical/mycoplasma/index.html#:~:text=My coplasma%20pneumoniae%20is%20a%20type,pneumonia%20caused%20by% 20other%20germs (last visited Dec. 15, 2020).

and, based on this information, agreed that there was no medical evidence of infection at the time of Lubin's evaluation on January 3, 2012.

Regarding Marta's later hospitalization, Levin testified that her blood cultures and sputum returned negative results, that the chest x-ray performed upon admission demonstrated no evidence of pneumonia, and that the CT scan demonstrated no acute abnormalities. He also agreed that, while she reported she felt as though she could not catch her breath, she was talking and conversing normally.

Levin further agreed that there was no documentation in the nurse's assessment, nor was it reported to her, that Marta had complained of a whooping sound. However, when she was examined later that morning, a doctor noted hearing a whooping sound coming from Marta when she inspired prior to coughing. That observation was the only record of a medical provider discerning that symptom.

As to damages, Levin testified that Marta suffered injuries as a result of defendants' alleged negligence because had Layne started antibiotics as of December 28, 2011, or had Lubin started antibiotics as of January 3, 2012, Marta's course would have been three to four days shorter. Furthermore, when he was asked to identify from plaintiff's answers to interrogatories which of

Marta's listed injuries were a result of defendants' failure to diagnose and treat her for BP, Levin stated her injuries included pericardial effusion, hiatal hernia, gastroesophageal reflux disease, urinary incontinence, and sleep irregularity. However, Levin could not "draw a straight line to each symptom's symptom," but stated that each of the alleged injuries were a consequence of defendants' failure to provide treatment.

However, on cross-examination, Levin testified that he could not, within a reasonable degree of medical probability, say that any of the alleged injuries occurred within the last three to four days Marta was symptomatic despite his earlier claims that had Layne started antibiotics on December 28, 2011, or Lubin started antibiotics as of January 3, 2012, Marta's course would have been three to four days shorter.

Levin was also unable to testify that, within a reasonable degree of medical probability, any of the alleged injuries could be causally related to defendants' alleged failure to treat Marta's BP. Similarly, with respect to testimony as to economic damages, Levin was unable to testify to a reasonable degree of medical probability that defendants' alleged failure to diagnose and treat Marta's BP led to plaintiff's claimed damages.

15

At the end of plaintiff's case, defendants moved for dismissal under Rule 4:40-1.[8]  After considering the parties' arguments, the trial judge granted the motion, finding that, based on Levin's testimony, plaintiff failed to establish that defendants had deviated from the applicable standard of care or that plaintiff's alleged damages could be connected to defendants' alleged negligence within a reasonable degree of medical probability.  Without that evidence, plaintiff failed to make a prima facie case for medical malpractice.

The judge found that, although Levin had adequately testified as to the standard of care applicable to Lubin and Layne, he had not connected the symptoms he observed in Marta's medical records sufficiently to establish a deviation from the applicable standard of care.  The judge stated Levin was unable "to point to the presence or absence of certain clinical symptoms that he felt either Nurse Layne or Dr. Lubin failed to take appropriate action on."  The judge concluded that although Levin suggested that defendants should have tested Marta for BP upon her two visits to Hightstown, he did not establish that defendants' diagnosis of upper respiratory infection deviated in any manner from professional norms.

---

[8]  At the point the trial judge considered defendants' motion to dismiss, the record consisted of only Levin's testimony and Marta's medical records which plaintiff had submitted into evidence at the close of his case.

Also, according to the trial judge, Levin's testimony constituted a net opinion with respect to the issue of a causal link between plaintiff's claimed damages and defendants' alleged negligence. She found that even though Levin had testified that defendants' alleged negligence had extended Marta's symptoms anywhere from "three to five days," his testimony did not connect her symptoms or medical issues to a relevant three to five day period "[s]uch that a jury would be in a position to be able to make a determination relative to damages [from] anything based in the record." Accordingly, the trial judge granted defendants' motion for dismissal with prejudice. This appeal followed.

## II.

At the outset, we observe that plaintiff has not briefed in his merits brief any challenge to the trial judge's dismissal of his complaint under Rule 4:40-1, although he responds in his reply brief to defendants' contention that dismissal was properly granted.[9] For that reason, we deem the issue to have been waived.

_____

[9] We also observe that despite making numerous legal arguments in his sixty-one-page merits brief, plaintiff mentions only one case in passing. Other than the one case, there is no legal support in the form of statutes, case law, or court rules identified or relied upon for any of plaintiff's arguments on appeal. See R. 2:6-2(a)(6); Hayling v. Hayling, 197 N.J. Super. 484, 488-89 (App. Div. 1984) (noting that under Rule 2:6-2(a)(5)—now 2:6-2(a)(6)—a party should provide "such parts of the record and such legal authorities as will be of help [to the court] in arriving at a proper determination.")

See R. 2:6-2(a)(6); Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014); N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015); Drinker Biddle & Reath, LLP v. N.J. Dep't of Law & Pub. Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (claims not addressed in merits brief deemed abandoned, and could not properly be raised in a reply brief); see also Pressler & Verniero, Current N.J. Court Rules, comment 5 on R. 2:6-2 (2020).

Even if he had, we discern no error in the complaint's dismissal substantially for the reasons articulated by the trial judge, in her oral decision of April 15, 2019, especially because no medical expert adequately testified to a deviation from the appropriate standard of care or that such deviation caused any of Marta's alleged injuries. See Worthy v. Kennedy Health Sys., 446 N.J. Super. 71, 91 (App. Div. 2016) (stating the elements to be proven by a plaintiff in a malpractice action that include a "deviation from th[e] standard of care, and . . . that the deviation proximately caused the injury").

III.

Rather than briefing that dismissal was unwarranted, plaintiff instead contends that for twelve separate, but at times overlapping, reasons the trial judge's ruling regarding the admission of a limited number of plaintiff's proposed learned treatises was improper. Plaintiff insists that had he been

18

allowed to admit all forty-two documents into evidence, he would have been able to satisfy his burden of proof. We disagree.

We will not overturn a trial judge's evidentiary rulings unless it is clear that the judge palpably abused his or her discretion. State v. R.Y., 242 N.J. 48, 64-65 (2020) (citing Brenman v. Demello, 191 N.J. 18, 31 (2007)). "[A]n abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Id. at 65 (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). See Est. of Hanges v. Metro. Prop. & Cas. Ins., 202 N.J. 369, 385 (2010) (applying a de novo review to the greater issue of the trial court's decision on a motion for judgment only after applying the more deferential abuse of discretion standard to an evidentiary ruling).

A publication is deemed a learned treatise "if it represents the type of material reasonably relied on by experts in the field." DaGraca v. Laing, 288 N.J. Super. 292, 300 (App. Div. 1996) (quoting Jacober by Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 495 (1992)). The admissibility of learned treatises is addressed by N.J.R.E. 803(c)(18) as an exception to the rule against the admission of hearsay. Under the Rule, information from treatises may be admitted if it is

[a] statement contained in a published treatise, periodical, or pamphlet, on a subject of history, medicine, or other science or art, if:

(A) the statement is relied on by an expert witness on direct examination or called to the attention of the expert on cross-examination; and

(B) the publication is established as a reliable authority by testimony or by judicial notice.

If admitted, the statement may not be received as an exhibit but may be read into evidence or, if graphics, shown to the jury.

[N.J.R.E. 803(c)(18).]

"[T]he purpose of the learned-treatise exception is to allow statements from the treatise to be admitted as substantive evidence, with the caveat that the expert be on the stand to explain the studies he or she relies on and testify to the methodology or assist in its application." State v. Terrell, 452 N.J. Super. 226, 257 (App. Div. 2016). Where there is doubt about a treatise's reliability, a trial judge should conduct a Rule 104 hearing either before or during trial, to determine whether the text qualifies as a learned treatise. Jacober, 128 N.J. at 496.

Contrary to the gist of all of plaintiff's contentions in this regard, learned treatises may not be qualified for admission under the Rule unless relied upon by an expert at trial during direct or cross-examination. Adamski v. Moss, 271 N.J. Super. 513, 519-20 (App. Div. 1994). They cannot be qualified by an expert

who is called at trial to only establish the proposed treatise's qualification. The expert must be on the stand to "explain the studies he or she relies on and testify to the methodology or assist in its application." Terrell, 452 N.J. Super. at 257.

Here, then, neither the motion judge nor the trial judge abused their discretion by not permitting plaintiff to rely upon deposition transcripts to establish the admissibility of any of his proposed learned treatises. Similarly, it was not an abuse of the trial judge's discretion to limit plaintiff to six documents instead of allowing the admission of the forty-two documents he proposed. Contrary to plaintiff's argument, the judge did not arbitrarily select the documents. As described earlier, she selected four documents based on Levin's testimony and allowed plaintiff to select the other two of the six from two different groups of documents. The judge's limitation on the number of documents was consistent with the "expect[ation that trial courts will] exercise discretion to prevent juries from being inundated with learned treatises," Jacober, 128 N.J. at 496, and consistent with a court's obligation to limit expert testimony where its admission is unnecessary or confusing. See Terrell, 452 N.J. Super. at 258-59.

IV.

We next consider plaintiff's argument that the trial judge improperly barred him or Levin from reading to the jury from his late wife's deposition transcript or from her answers to interrogatories. Here again we find no merit to his contentions.

It is beyond cavil that portions of a deposition transcript from a witness who is unavailable at trial because of death may be read to the jury under Rule 4:16-1(c) "by any party for any purpose." So too under certain conditions can the unavailable witness's interrogatory answers be allowed. R. 4:17-8; See Ramos v. Cmty. Coach, 229 N.J. Super. 452, 455-58 (App. Div. 1989).

Here, however, there is nothing in the record to establish that the trial judge barred plaintiff from using his late wife's deposition, and contrary to his assertions, the judge allowed Levin to read from Marta's answers to interrogatories during his testimony. Under these circumstances, plaintiff has failed to demonstrate how the trial judge abused her discretion in this regard.

V.

In his final point, plaintiff attempts to argue that New Jersey's Patients First Act is unconstitutional. However, he does not describe the basis for his argument. Rather, plaintiff attempts to incorporate by reference arguments he

22

made to this court in an earlier motion for leave to appeal that we denied on March 20, 2017.  See Lukacs v. Hightstown Med. Ctr., No. AM-0367-16 (App. Div. March 20, 2017).  He also refers to a motion he allegedly made during trial about the Act and his need for additional discovery, without any discussion of any applicable law or legal basis for his contention.  Under these circumstances, we are constrained to conclude plaintiff waived his contention about the Act because his arguments have not been properly briefed.  R. 2:6-2(a)(6); N.J. Dep't of Env't Prot., 438 N.J. Super. at 505 n.2.

## VI.

Finally, to the extent we have not specifically addressed any of plaintiff's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION